UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| DENNIS RIDER, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 5: 18-456-DCR |
| | ) |
| V. | ) |
| | ) |
| BLUEGRASS OXYGEN, INC., | ) **MEMORANDUM OPINION** |
| | ) **AND ORDER** |
| Defendant. | ) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Bluegrass Oxygen, Inc. ("BGO") has filed a motion for summary judgment, asserting that there is no evidence from which a jury could conclude that Plaintiff Dennis Rider's employment was terminated because of his daughter's disability. [Record No. 44] Rider has not come forth with sufficient evidence to create a genuine dispute of material fact regarding the claims asserted by Rider. As a result, BGO's motion for summary judgment will be granted and Rider's claims will be dismissed.

**I.**

BGO is a durable medical equipment provider that focuses on the sale of oxygen and positive airway pressure ("PAP") machines. [Record No. 44-2] Rider is a former general manager of the Cincinnati/Covington branch of BGO. [Record No. 44-3, p. 2] In that role, he was in charge of administrative work and oversight of the branch. [Record No. 44-3, pp. 3-4] This included keeping track of inventory, billing, and paperwork. [*Id*.] Rider also saw patients and conducted respiratory follow-ups. [*Id*.] Additionally, he was in charge of marketing and bringing in referrals for new business. [Record No. 44-2] Rider was hired in August 2001.

[Record No. 44-3] Rider was notified on October 25, 2017, that he would be terminated on November 30, 2017, because the company was losing income and intended to downsize. [Record No. 44-3, pp. 6-8] His termination date was moved up to November 24, 2017.

Rider's daughter was born in late 2013 and in January 2014 she was diagnosed with cystic fibrosis. [Record No. 44-3, p. 12] Rider and his family were insured under BGO's health care plan. [Record No. 44-3, p. 16] Rider's daughter was prescribed a certain medicine, Kalydeco, "around 2014" which cost somewhere between $200,000.00 and $300,000.00, per year. [Record No. 44-3, pp. 20, 30] Rider received healthcare coverage under COBRA following his termination. [Record No. 44-3, pp. 19, 60]

Michael Marnhout, the majority owner of BGO, discussed with Rider the high cost of the medicine taken by his daughter, but Marnhout told him that the cost did not matter and that they had to take care of her. [Record No. 44-3, p. 22-26] Rider asserts that Marnhout told him that his daughter alone was putting a burden on the cost of health insurance for the company. [Record No. 44-3, p. 22] Lisa Helton, the human resources officer for BGO, discussed with the plaintiff whether there existed a cheaper alternative to the drug his daughter was taking and whether she would be on the medicine long term. [Record No. 44-3, p. 22, 29-30] Rider alleges that BGO did not want to continue Rider's employment due to the high cost of his daughter's medical needs. BGO terminated Rider on October 25, 2017. Rider was told that the reason was "downsizing." [Record No. 44-3, p. 6] However, BGO alleges that Rider was terminated due to his performance, declining income at the Covington branch, and the shifting focus of the Covington branch to a service center. [Record No. 44-3, pp. 6-7]

BGO planned to change its medical insurance plan in December 2017. All of the employees except for Rider received an e-mail regarding the new insurance plan on October

25, 2017. [Record No. 1, p. 3] Rider acknowledged that the benefit plans changed annually and he previously helped research and solicit plans to keep costs down. [Record No. 44-3, p. 9; Record No. 47-1, p. 4]

The durable medical equipment business has been struggling in recent years. Marnhout explained in his deposition that "forty-plus percent of the companies in the durable medical equipment industry [shut down] over the last seven years." [Record No. 44-2] From 2015 to 2018, the Covington branch of BGO steadily lost income. [Record No. 44-7] It lost a Medicare competitive bid in 2015, which reduced the business of the Covington branch. [Record No. 44-3, pp. 39-40] Management allegedly started having concerns about Rider's management skills and his inability to bring in referrals to generate PAP business from hospitals and other healthcare providers. [Record No. 44-2, pp. 9, 25] Marnhout testified at his deposition that he talked to Rider about his marketing issues at least monthly from 2014 to the date he was terminated. [Record No. 44-2, p. 27] He further explained that there was an increase in untimely filing and authorizations from third-party payors. [Record No. 44-2, p. 30-31] Additionally, there were inventory control issues at the Covington branch including a 26.37% inventory loss from 2014 to 2017. Marnhout asserts that he discussed these issues with Rider, but Rider alleges that no one spoke to him about any performance issues he was experiencing. The only standard was to give "110%." [Record No. 44-2, p. 10] Ultimately, the Covington branch closed permanently closed six months after Rifer was terminated from BGO.

Rider filed a Charge of Discrimination with the Equal Employment Opportunity Commission on March 8, 2018. [Record No. 1, p. 4] On April 18, 2018, the EEOC issued a Notice of a Right to Sue and Rider commenced this lawsuit thereafter. [Record No. 1, p. 4] Rider filed eight claims for associational discrimination under the Americans with Disabilities

Act ("ADA") and the Kentucky Civil Rights Act ("KCRA"); age discrimination under the Age Discrimination and Employment Act ("ADEA") and the KCRA; a violation of the Employment Retirement Income Security Act ("ERISA"); and a claim for a failure to provide business records under the KCRA. [Record No. 1, p. 4-9] BGO and Marnhout filed a partial motion to dismiss. In response, Rider filed an amended complaint leaving only his ADA claim, ERISA claim, and a claim for business records under the KCRA. [Record No. 28]

## II.

Summary judgment is appropriate if there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). The determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

Once the moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party cannot rely on the assertions in its pleadings; rather, it must come forward with probative evidence to support its claims. *Celotex*, 477 U.S. at 324. In deciding whether to grant summary judgment, the

Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 58.

### III.

A. **Rider has not produced evidence to demonstrate a *prima facie* case of associational discrimination in violation of 42 U.S.C. § 12112(b)(4). And even if he could, he cannot show that the legitimate, non-discriminatory reason offered by BGO for his termination was pretextual.**

Section 12112(b)(4) of the ADA prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." Associational discrimination typically arises under three theories: an expense theory, disability by association theory, and a distraction theory. *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011). Rider is bringing his claim under an expense theory, which "covers situations where an employee suffers an adverse employment action because of his or her association with a disabled individual covered under the employer's health plan, which is costly to the employer." *Id*. Discrimination claims can be shown through either direct evidence of discrimination or through indirect evidence under the *McDonnell Douglas* burden-shifting framework. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996) (overruled on other grounds).

i. **Direct Evidence of Discrimination**

"Where a plaintiff presents direct evidence of discriminatory intent in connection with a challenged employment action, 'the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination.'" *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)

(quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). "Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Thompson v. City of Lansing*, 410 F. App'x 922, 929 (6th Cir. 2011) (internal citations and quotations omitted). "Direct evidence is evidence that proves the existence of the fact without requiring any inferences." *Merrill v. Burke E. Port Mach. Co.*, 159 F. App'x 676, 679 (6th Cir. 2005) (citing *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)).

Rider asserts that he has direct evidence of discrimination including:

• In 2016, Marnhout told Rider that his daughter's medication is expensive and asked whether Elizabeth was going to be on that medication for a long period of time.

• In 2016, Helton told Marnhout of the high cost of Elizabeth's medication.

• Marnhout told Rider that Elizabeth alone was putting a burden on the cost of insurance for the entire company.

• In 2017, Helton asked Rider if the medication Elizabeth takes is ever going to be provided in generic form and will Elizabeth be on that medication long term.

• Information provided to Helton in April of 2017 that the Kalydeco medication prescribed for Rider's daughter was a long-term medication.

• On October 25, 2017, Helton emailed employees of the company including Marnhout that BGO was looking at a 20-25% increase in health insurance costs from Anthem.

• That same day (October 25, 2017) Rider was terminated.

[Record No. 46, p. 11] These statements, even if believed, do not compel the conclusion that the defendant was terminated because of his daughter's disability. All of the statements set forth by Rider would require the Court to make inferences to conclude that there was an

improper motive for his termination. *See Stansberry*, 651 F.3d at n.1. Further, comments made by Helton cannot serve as direct evidence of discrimination because she was not involved in the decision-making process regarding whether to terminate Rider's employment. *See Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003). Accordingly, Rider has not presented direct evidence of discrimination.

### ii. Indirect Evidence of Discrimination

To demonstrate a *prima facie* case of associational discrimination, Rider must show that: he was qualified for the general manager position, suffered an adverse employment action, he was known to associate with a disabled individual, and "the adverse employment action occurred under circumstances that raise a reasonable inference that the disability of the relative was a determining factor in the decision." *Stansberry*, 651 F.3d at 487 (adopting the *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1084-85 (10th Cir. 1997) formulation of the *McDonnell Douglas* test). If Rider can establish a *prima facie* case of associational discrimination, the burden shifts to BGO to provide a legitimate non-discriminatory reason for the termination. But if it provides a legitimate non-discriminatory reason, the burden shifts back to Rider to show that the proffered reason for his termination was pretextual. *Russell v. Lew*, 549 F. App'x 389, 395 (6th Cir. 2013) (internal citations and quotations omitted).

#### a. Prima Facie Case

BGO concedes that: (1) Rider's daughter was disabled; (2) it was aware of her disability; and (3) Rider was qualified for the position. [Record No. 44-1, p. 15] However, it asserts that Rider cannot point to any evidence that would lead a reasonable juror to infer that his termination was related to his daughter's disability. BGO explained that the durable medical equipment business was struggling and there was pressure on Rider to bring in new

business. However, BGO asserts that Rider failed to bring in new business and failed to keep adequate records of inventory and billing, causing a loss of income.

Rider lists the same evidence that he identified regarding his claim of direct evidence of discrimination to support his *prima facie* case, plus he notes the following additional evidence:

- The Kalydeco medication cost between $200,000 to $300,000 per year.

- The first time BGO was seeking new rates for its employees' health insurance occurred in 2017 during which there was a 20-25% increase in health insurance costs.

- Rider was not included on the October 25, 2017 notice for the employees to send in an application for health insurance.

- Rider was referred to in e-mail correspondence between Helton and the insurance broker as one of those employees who left prior to December that "jacked up ya'lls claims through the ceiling".

- In an October 25, 2017, e-mail string with the insurance representative, Helton expressed her hope that Rider would not be able to afford the high cost of Cobra insurance.

[Record No. 46, p. 14-15]

The United States Court of Appeals for the Sixth Circuit has noted that cases dealing with the "expense" theory of associational discrimination "require some showing that the potential medical expenses of the fired employee were on the minds of the decision maker at the time of the termination" *Gaglioti v. Levin Group, Inc.*, 508 F. App'x 476, 485 (6th Cir. 2012). And comments about rising health care costs may raise a reasonable inference that Rider was fired because his daughter's disability was too expensive. *Lyons v. Core Sys., L.L.C.*, No. 2:10-75, 2011 U.S. Dist. LEXIS 106368 (S.D. Ohio 2011). However, the comments made about Rider's daughter's medical costs either took place years before his

termination or were statements made by non-decisionmakers. Rider testified that Marnhout discussed the expense of his daughter's medication in 2016 -- more than a year before his termination. [Record No. 44-3, p. 22-26] Additionally, any statements by Helton or the insurance representative were statements by non-decisionmakers. *See Rowan*, 360 F.3d at 550.

In *Stansberry*, the plaintiff argued he was terminated because he was discharged shortly after his wife's disability worsened. However, the Sixth Circuit concluded that he could not establish his *prima facie* case because the defendant knew of his wife's disability for a long period. 651 F.3d at 488. Further, the court explained there was substantial evidence in the record that the plaintiff was not satisfactorily performing his job, he did not report security violations, and he did not keep operations within budget. *Id*. It further noted that, even though he disputed the characterization of certain meetings, the plaintiff offered nothing to show that the termination related to his wife's disability rather than perceived unsatisfactory performance. *Id*.

Similar to *Stansberry*, BGO knew about Rider's daughter's disability for four years prior to his termination as his daughter had been on prescribed Kalydeco since "about 2014." *See also Burus v. Wellpoint Cos*. 2010 U.S. Dist. LEXIS 28798 (E.D. Ky. Mar. 25, 2010) (concluding that a two-and-a-half-year gap between telling her company about her husband's illness and her termination was too great of a gap to raise an inference of discrimination); *Gaglioti*, 508 F. App'x at 484. Rider asserts that the rising cost of her medication in more recent years and rising health care costs contributed to his termination because of her disability. However, the inference that Rider was terminated because of his daughter's illness is undercut by the fact that she had been insured by the company for four years prior to the termination and had been taking the medication since 2014. [Record No. 44-3, p. 20]

Rider also points to rising health care costs in 2017 to support an inference of discrimination. However, he testified that healthcare rates rose most years and he had previously been involved in researching health insurance plans for the company from different carriers in an effort to keep costs down. [Record No. 47-1, pp. 4-6] Rider testified that he looked at different carriers and rates every year before Marnhout made the decision regarding which carrier to select.

Rider has not demonstrated a *prima facie* case of associational discrimination under the facts presented. But even if that he had, he cannot show that the legitimate non-discriminatory reason set forth BGO was pretextual.

b. **The Legitimate Non-discriminatory Reason for the Termination**

BGO has demonstrated a legitimate, non-discriminatory reason for Rider's termination. It asserts that Rider was terminated due to declining income at the branch he managed, that Rider was not meeting marketing standards, and that Rider was losing track of inventory, resulting in further losses for the company. [Record No. 44-2, pp. 25-31] Further, Marnhout testified that BGO was attempting to shift the branch to a service center to keep it viable. However, the branch nevertheless closed six months later. Rider does not discuss the legitimate, non-discriminatory reason but merely moves on to the issue of pretext.

c. **Pretext**

Because BGO has demonstrated a legitimate, non-discriminatory reason for Rider's termination, Rider must show that the proffered reason for his termination was pretextual to avoid summary judgment. To show pretext, Rider must offer evidence that the "legitimate non-discriminatory reason: (1) has no basis in fact; (2) did not actually motivate the

defendant's conduct; or (3) was insufficient to warrant the challenged conduct" to show pretext. *Russell*, 549 F. App'x at 395.

"To prove that an employer's explanation had no basis in fact, . . . the plaintiff must present evidence that the proffered bases for discharge never happened." *Smith v. Hinkle Mfg., Inc.*, 36 F. App'x 825, 829 (6th Cir. 2002); *see also Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994). Here, Rider cannot show that the proffered bases for discharge never happened. Instead, BGO has demonstrated that the Covington branch continued to lose money, that the company tried to shift the branch to a service center, and that the branch was struggling with inventory loss as it unsuccessfully attempted to bring in new business. [Record No. 44-2; *see Russell v. Geithner*, No. 2: 09-cv-00975, 2012 U.S. Dist. LEXIS 162016, *39-40 (S.D. Ohio Nov. 13, 2012).] For example, the Covington branch experienced a 26.37% inventory loss from 2014 to 2017 -- the highest loss suffered by any BGO branch. [Record No. 44-9] BGO's contention is further supported by the branch's closure six months after Rider's termination. And Rider has not produced evidence demonstrating the existence of a genuine issue of material fact that BGO's stated reason had no basis in fact.

To prove that BGO's reason did not actually motivate the discharge, Rider must "put forth evidence that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). The "key inquiry is whether the employer made a reasonably informed and considered decision before taking the complained-of-action*." Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2001) (*quoting Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007)). Here, Rider has not offered any evidence that BGO did not

"honestly believe" the proffered reason for its adverse employment action. Instead, BGO has produced evidence that the Covington branch was struggling with income losses following the loss of the Medicare bid, Rider was not generating additional referral business, there were issues with billing and receiving money, and there were issues of inventory control at the Covington branch. [Record Nos. 44-7; 47-6; 47-8; 47-9; 47-10]

Rider points to statements by Lisa Helton regarding the cost of health insurance to other individuals as evidence of pretext for terminating him. But as BGO correctly notes, "[s]tatements by non-decision makers, or statements by decision makers unrelated to the decisional process itself can not suffice to satisfy the plaintiff's burden of demonstrating animus." *Rosenthal v. Faygo Bevs., Inc.*, 701 F. App'x 472, 480 (6th Cir. 2017) (quoting *Rowan*, 360 F.3d at 550).

In *Lyons*, the court concluded that while repeated statements about the high cost of health care raised a reasonable inference that the plaintiff was fired because his wife's disability was too expensive, these statements were not sufficient to show that the legitimate reason offered was merely pretext. 2011 U.S. Dist. LEXIS 106368 at *43. The court noted that the plaintiff's wife had been sick for years and there was no evidence indicating that her condition worsened around the time of his termination. *Id*. As a result, the court granted the defendant summary judgment on the plaintiff's associational discrimination claim. *Id*. at 44. Here, while there may have been statements about the rising cost of health care, these statements are insufficient to show pretext. The evidence establishes that Rider's daughter had been on BGO's health insurance for four years, that BGO knew about her illness, and that the daughter had been receiving Kalydeco medication since 2014. [Record No. 44-3, p. 20]

There is also evidence in the record that Rider was not satisfactorily performing his job. Rider testified that his job duties included administrative and oversight of the office, including inventory and billing. [Record No. 44-3, p. 2-4] Additionally, Rider was in charge of marketing and bringing in referral business. Marnhout and BGO President Craig Coleman testified that the Covington branch was losing money, there were issues with inventory leading to greater monetary losses, and Rider was not bringing in sufficient referral business. [Record No. 44-2, pp. 26-27, 29; Record No. 44-2, pp. 20-21; Record No. 44-9] Further, there were issues of proper and timely billing at the Covington branch. [Record No. 47-8] For example, the Covington branch represented 22% of the denials for authorizations from third-party payors because of untimely and improper filing. [Record No. 44-2, p. 31] And as noted previously, the Covington branch had the highest inventory loss of any branch at 26.37%. [Record No. 44-9] Coleman and Marnhout testified that they discussed with Rider his performance and areas needing improvement. [Record No. 48-3, pp. 5-8] While Rider asserts that no one ever spoke to him about his performance, he did admit that there were conversations about "authorizations, CMNs, and you know things of that nature." [Record No. 47-1, p. 11]

Rider also asserts that BGO changed its reason for his termination. He asserts that he was told that the company was downsizing and that was the reason for his termination. He stated that BGO explained that, due to the downturn in the industry, it was going to turn the location into an in-and-out service center rather than an advanced oxygen business. [Record No. 47-1, pp. 2-3] This is consistent with the fact that the Covington branch was struggling financially and looking for ways to remedy its financial situation. Accordingly, Rider has not put forth evidence to show that BGO did not honestly believe in its reason for terminating him.

Finally, a plaintiff can overcome summary judgment by establishing that the reason for termination was insufficient by presenting "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in conduct substantially identical to that which the employer contends motivated its discharge of the plaintiff." *Smith*, 36 F. App'x at 829-30 (internal citations and quotations omitted). Here, Rider has not presented any evidence of substantially identical employees who were not terminated for similar conduct.

Accordingly, Rider has not produced sufficient evidence to demonstrate that BGO's reason for his termination was pretextual.

**B.   Rider has not produced evidence to demonstrate that there is a genuine issue of material fact regarding whether BGO interfered with his health benefits in violation of ERISA § 510.**

Under section 1140 of ERISA, it is "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this title, section 3001 [29 U.S.C. § 1201], or the Welfare and Pension Plans Disclosure Act." To survive summary judgment, Rider must produce either direct or indirect evidence that BGO had the specific intent to violate ERISA. *Scheitzer v. Teamsters Local 100*, 413 F.3d 533 (6th Cir. 2005).

To demonstrate interference indirectly, Rider must show "the existence of a genuine issue of material fact that there was: (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992). In other words, Rider must demonstrate that BGO has the specific intent to violate ERISA by offering evidence that

interfering with his health insurance was a motivating factor in his termination. *See id*. If Rider offers a *prima facie* case of interference, then the burden shifts to BGO to provide a legitimate non-discriminatory reason for its action. If BGO provides a legitimate non-discriminatory reason then Rider must show that the proffered reason constitutes pretext. *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997). To meet his burden at the *prima facie* stage, Rider "must point to specific evidence that shows that the desire to reduce medical costs motivated his termination." *Gaglioti*, 508 F. App'x at 485.

At the outset, "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich. Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). In the present case, Rider has not addressed his ERISA claim in his response to BGO's motion for summary judgment. However, even if he had offered such proof, his ERISA claim would fail for the same reasons causing the failure of his ADA claim. In short, Rider has not offered any direct evidence of interference with his benefits, nor has he produced sufficient evidence to demonstrate a *prima facie* case.

BGO cites *Turner v. Humana, Inc*., where the Southern District of Ohio concluded that the plaintiffs had not produced "evidence demonstrating that they were prevented from attaining substantial benefits." 901 F. Supp. 2d 1035, 1044 (S.D. Ohio. 2012). There, the court explained that the plaintiffs had received all the benefits to which they were entitled while one of the plaintiffs was employed with the defendant and they continued to receive medical benefits for a year and a half after his termination. Similar to *Turner*, Rider and his daughter were covered by BGO's health insurance for four years prior to his termination and were covered under COBRA for an additional eighteen months after Rider's termination.

Accordingly, the plaintiff has not offered sufficient evidence to demonstrate a genuine issue of material fact on his ERISA claim.

### C. Rider has not produced any evidence that BGO failed to provide corporate records for inspection in violation of Kentucky Revised Statutes § 271B.16-040(1).

In his amended complaint, Rider requests an order requiring the production of documents and reasonable attorney's fees and costs associated with this request. [Record No. 28, p. 7] He attached a copy of a letter from his attorney requesting to copy the records. [Record No. 28-6] But BGO asserts that this Court is not the appropriate court through which to request the documents and that BGO informed Rider that he could go to its offices to view the records. Marnhout explained in his deposition that the company offered to allow the plaintiff to copy the requested documents at the company offices at any time. [Record No. 44-2, p. 34]

Kentucky Revised Statutes ("KRS") Section 271B.15.040 requires that a corporation allow a shareholder to inspect and copy certain records upon request. And a shareholder is entitled to inspect and copy corporate records described in KRS § 271B.16-010(5) if he or she provides a written demand at least five days before he or she wishes to inspect or copy the records. "For a shareholder to be denied attorney's fees, the corporation must have effectively denied a shareholder's right to inspect and copy records, either outright refusal or by failure to act in a reasonable time." *Wilcher v. Int'l Envtl. Techs., Inc.*, 168 S.W.3d 58, 62 (Ky. Ct. App. 2005).

Rider has not offered any argument or evidence that he was denied the right to inspect the records in issue. And again, the undersigned notes that a plaintiff is deemed to have abandoned a claim when he or she fails to address it in response to the defendant's motion for

summary judgment. *Brown*, 545 F. App'x 368. Thus, there is no genuine issue of material fact and this claim will be dismissed.

## IV.

For the reasons set forth above, it is hereby

**ORDERED** as follows:

1. Defendant Bluegrass Oxygen, Inc.'s motion for summary judgment [Record No. 44] is **GRANTED**.

2. Plaintiff Dennis Rider's claims for a violation of 42 U.S.C. § 12112(b)(4) (Count One), violation of ERISA § 510 (Count Two), and violation of KRS § 271B.16-040(1) (Count Three) are **DISMISSED**, with prejudice.

3. The trial of this action, previously scheduled to begin on Monday, January 6, 2020, is **CANCELED**.

Dated: October 7, 2019.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky